UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CASE NO. 18-10017 |
| | * | |
| MICHAEL ALLEN WORLEY | * | CHAPTER 11 |
| | * | |
| DEBTOR | * | |

\* \* \* \* \* \* \* \*

## OBJECTION TO DISCLOSURE STATEMENT

Callais Capital Management, LLC ("Callais"), creditor herein, respectfully objects to the Disclosure Statement for Plan of Liquidation filed by Michael Allen Worley ("Debtor") and the Unsecured Creditor's Committee ("UCC") as follows:

## BACKGROUND

On January 8, 2018, the Debtor filed this bankruptcy case. The UCC was appointed in this case on February 15, 2018.[1] On May 8, 2018, the Debtor and the UCC filed a Disclosure Statement [Doc. 98] and Plan [Doc. 99]. On May 24, 2018, Callais filed a Motion for Rule 2004 Examination of Debtor [Doc. 114]. On May 25, 2018, this Court entered an Order [Doc. 116] requiring that the Debtor appear for examination on June 28, 2018 and produce requested documents by June 18, 2018.

Callais is, by far, the largest unsecured creditor in this case. As of the date of the filing this

---

[1] Despite its position as the largest unsecured creditor in this case, Callais is not on the unsecured creditors committee. The United States Trustee's letter advising Callais of the opportunity to serve on the committee was dated Tuesday, February 6, 2018 and was not received by Callais until Thursday, February 8, 2018 (and only then when provided by counsel by email; the mailed copy was not received until on or about February 14, 2018). The United States Trustee's letter required that acceptance be received by the US Trustee's Office no later than 10 days from the date of the letter, or by February 16, 2018. Due to the Mardi Gras holiday (Mardi Gras was on Tuesday February 13, 2018), Callais' acceptance form was not received by the US Trustee prior to the deadline. Despite Callais' requests, the US Trustee declined to consider Callais' late acceptance.

1

case, the Debtor owed Callais $24,847,447.80.

Callais' claim against the Debtor arises from his guaranty of loans made by Callais to W Resources, LLC, an entity owned by the Debtor, and to Sqor, Inc., an entity partially owned by the Debtor and on whose board the Debtor served. For further background regarding its claims, Callais references and incorporates herein its Proof of Claim no. 10 filed in this case and its Complaint Objecting to Dischargeability of Debts filed in this case and pending as adversary proceeding no. 18-010201.

On May 9, 2017, Callais filed two lawsuits against Debtor: one on his guaranty of the indebtedness of Sqor, Inc. (the "Sqor Suit"), and a separate suit against Debtor on his guaranty of the indebtedness of W Resources, LLC (the "W Resources Suit"), both of which suits were filed in Louisiana state court. On August 10, 2017, Debtor filed a reconventional demand against Callais in the Sqor Suit, alleging that Callais should be liable to Debtor for the diminution in value of his ownership of shares in Sqor, Inc., "due to its actions and failure to act at a time when the management of the Company was involved in active negotiations for the sale of the Company at a substantial profit." Debtor's Reconventional Demand, Aug. 10, 2017, at ¶ 17. Callais filed various exceptions in response, including an exception of no cause of action, which was sustained by the District Court. On October 20, 2017, the Court dismissed Debtor's reconventional demand, with prejudice.

After the Court dismissed Debtor's reconventional demand, Callais moved for summary judgment against Debtor on the Sqor guarantees. The hearing on Callais' motion for summary judgment—to which Debtor filed no opposition—was set for January 9, 2018. On January 8, 2018, Debtor filed his Bankruptcy Petition [Doc. 1] in this case.

In the Debtor's December 31, 2015 Financial Statement provided to Callais, the Debtor

represented his ***positive*** net worth to be ***$148,019,319.00*** with assets of $184,598,785.00 and liabilities of $36,494,466.00. *See generally* Michael Worley, Statement of Financial Condition [Doc. 117-8]. In his Amended Schedules, the Debtor indicates a ***negative*** net worth of ***($33,506,371)***, with assets of $80,455,000.00 and liabilities of $113,961,371.63. *See* Debtor's Official Form 106 [Doc. 90], at 2. With an apparent swing in net worth over $180 million in just ***two years*** (from $148,019,319.00 to ($33,506,371)), Callais has many, many questions. The Disclosure Statement does not provide many answers.

The Plan raises more questions. The Plan provides that a liquidating trustee will sell not only the Debtor's property but that of the Debtor's affiliates (such that the affiliates would not have to file bankruptcy). The Plan proposes that a "Liquidating Trustee" will be appointed to:

> . . . be the non-member manager with exclusive authority to act on behalf of the Affiliates for the purposes consistent with the terms of this Joint Plan, which include, *inter alia:* (1) transferring property to the Liquidating Trust; (2) liquidating Trust Assets; (3) enforcing and prosecuting claims, rights, interests and privileges of Liquidating Trust, including Causes of Action; (4) filing appropriate tax returns; and (5) assisting in the administration of the Plan and the Liquidating Trust and taking such actions as are necessary to effectuate this Joint Plan. To the extent deemed advisable or necessary, the Liquidating Trustee shall have the power to amend any and all corporate formation documents to reflect that any juridical entity owned by the Debtor, the equity of which is transferred to the Liquidating Trust, is manager managed, or to be amended in any other way. The Liquidating Trustee shall serve as the representative of the Estate until the entry of a final decree in the Bankruptcy Case.

Plan, p. 19. Other than W Resources LLC, the Disclosure Statement and Plan do not state what other entities are included in the definition of affiliate. Plan, p.1. In addition, the Plan provides that the assets of the Debtor's estate will be transferred into the Liquidating Trust. The Plan states that the Liquidating Trustee shall have full authority to object to claims and pursue causes of action. The Plan further provides that "Liquidating Trustee of Liquidating Trust may retain such law firms, including counsel to the Committee or professionals retained by the Debtor or the Committee . . ."

Plan, p. 20. The Plan contemplates that W Resources LLC and the Debtor's other affiliates will be managed by the Liquidating Trustee rather than filing bankruptcy.

While Callais appreciates the necessity of liquidating the property of the Debtor's affiliates (where most of the Debtor's property purports to be held), Callais is concerned that a liquidation outside of the affiliates' bankruptcy cannot be effectively managed. Moreover, Callais is concerned that the Liquidating Trustee will not be effectively armed to investigate and pursue any necessary actions to recover assets which may have been placed outside of the reach of creditors. Further, and as set forth herein, Callais has a number of questions regarding how the proposed process would operate and how it would maximize creditor recovery. Callais raises a number of additional objections stated herein regarding information contained and not contained in the Disclosure Statement. For these reasons and the other reasons stated herein, Callais requests that this Court not approve the Disclosure Statement.

**STANDARD**

Section 1125 of the Bankruptcy Code requires a debtor, prior to soliciting votes for the confirmation of a plan, to file a disclosure statement containing adequate information to allow creditors and holders of equity interests to arrive at an informed judgment whether to accept or reject the debtor's plan. 11 U.S.C. § 1125; *see also In re Divine Ripe, LLC*, 554 B.R. 395 (S.D. Tex. 2016). "Adequate information" is defined in § 1125(a)(1) as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical, reasonable investor . . . to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). The determination of what is adequate information is subjective and is made on a case by case basis. *In Re: Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988). Courts and commentators list

nineteen factors to consider in determining whether a debtor has provided adequate information to approve a disclosure statement. 7 COLLIER ON BANKRUPTCY ¶ 1125.02[2], l125-10 and 11 (December 2010). While not all of the factors are relevant to this case, nor is the list exhaustive, a comparison of the factors to Debtor's proposed Disclosure Statement shows that "adequate information" is not provided, as some of the following factors are not yet addressed:

(1) The circumstances that gave rise to the filing of the chapter 11 petition;
(2) A complete description of the available assets and their value;
(3) The anticipated future of the debtor;
(4) The source of the information provided in the disclosure statement;
(5) A disclaimer, which typically indicates that no statements of information concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement;
(6) The condition and performance of the debtor while in chapter 11;
(7) Information regarding claims against the estate;
(8) A liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;
(9) The accounting and valuation methods used to produce the financial information in the disclosure statement;
(10) Information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;
(11) A summary of the plan of reorganization;
(12) An estimate of all administrative expenses, including attorneys' fees and accountants' fees;
(13) The collectibility of any accounts receivable;
(14) Any financial information, valuation or pro forma projections that would be relevant to creditors' determination of whether to accept or reject the plan;
(15) Information relevant to the risks being taken by the creditors and interest holders;
(16) The actual or projected value that can be obtained from avoidable transfers;
(17) The existence, likelihood and possible success of non-bankruptcy litigation;
(18) The tax consequences of the plan; and
(19) The relationship of the debtor with affiliates.

A creditor cannot make an informed judgment about whether to vote for or against the Plan unless the creditor and all other creditors and interest holders know how likely the Plan is to succeed. In short, the creditor must know if the Plan is feasible. *Pizza of Haw., Inc. v. Shakey's Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).

5

In addition, a disclosure statement should not be approved where it describes a plan that is so fatally and obviously flawed that it cannot be confirmed. *See In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr. D. Mass. 1991). Such a disclosure statement "must be denied approval in order to avoid a costly and futile solicitation process." *In re R&G Props.*, 209 Bankr. LEXIS 2101 (Bankr. D. VT 2009) citing *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("Submitting the debtor to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would delay any possibility of a successful reorganization.") (citing *In re Pecht*, 53 BR 768, 768-69 (Bankr. E.D.Va. 1985)). Because the Debtors' current Plan contains such obvious flaws, it is appropriate to address these issues at this stage in the case.

## OBJECTIONS

*Structural Objection*

The Disclosure Statement does not adequately address how a liquidating trustee appointed in this case will be in a position to properly liquidate the assets of the Debtor's affiliates to maximize creditor recovery. In its current form, the Plan does not appear to be feasible or confirmable.

As explained above, the Disclosure Statement and Plan contemplate that a liquidating trustee will be appointed to liquidate the Debtor's assets and to act as a manager of the Debtor's affiliates so as to liquidate their assets outside of bankruptcy. However, without the protections and powers afforded by the Bankruptcy Code, a liquidating trustee will not be able to properly liquidate the affiliates' assets or properly investigate and pursue causes of action.

Under the Plan, the affiliates would not have to file sworn schedules, and the Debtor, as their representative, will not have to fully disclose, under penalty of perjury and under all of the

consequences of federal law, the financial affairs of the affiliates. Callais suspects that many of its questions may find answers in the sworn schedules of W Resources and the other affiliates. Further, the liquidating trustee will not have the ability to bring Chapter 5 causes of action, revocatory actions under Louisiana law (since it is not a creditor), or other actions available to a trustee in a bankruptcy case. For example, if W Resources, LLC transferred assets for inadequate consideration, the liquidating trustee will not have a procedural mechanism to recover such assets. The liquidating trustee will not be able to fully employ Rule 2004 or other avenues for discovery available under the Bankruptcy Code and Bankruptcy Rules. Other than W Resources, LLC, the Disclosure Statement and Plan do not state what other entities are even included in the definition of affiliate. Plan, p.1

Further, the liquidating trustee will not be able to sell property under section 363 free and clear of liens, reject leases under section 365, or take such other actions as are normally required to liquidate property of a bankruptcy estate. While page 24 of the Plan seems to suggest that the Liquidating Trustee will have the power to sell property of the affiliates free and clear liens,[2] such a provision is plainly unenforceable and outside of the relief that the Plan or the Court in this case can grant. Because the affiliates will not have filed schedules, and creditors of each of the affiliates will not have filed proofs of claim, the liquidating trustee will not know for certain what claims may exist and will not have a platform to expeditiously resolve objections to claims against the affiliates. Presumably the liquidating trustee would first have to satisfy the claims of the affiliates before any funds could be disbursed to the creditors of the Debtor. The liquidating trustee is not positioned to properly accomplish this task.

---

[2]     On page 24, the plan states " . . . and all lienholders who hold liens, claim or encumbrances on such property shall release any and all liens, claims or encumbrances against the property so sold notwithstanding application of the Foreclosure Alternative Commission." The Plan does not explain how the trustee would or could enforce this clearly unenforceable provision.

Further, the liquidating trustee, under the proposed Plan, will be inherently subject to conflicts. The Debtor's estate may have significantly different interests than those of an affiliate and its creditors. If the Debtor is discovered to have transferred property to W Resources that is subject to revocation or a claim of simulation, how will the liquidating trustee—who will presumably have duties to both the Debtor's estate and each entity for which he is appointed as a manager—handle such a situation? The estate's and the affiliates' respective interests are not necessarily aligned. To make matters worse, under the Plan, the liquidating trustee is authorized to employ counsel for the creditors committee and the Debtor. Callais respectfully submits that both counsel for the creditors committee and the Debtor would have conflicts in such a representative given their existing representations and in light of the liquidating trustee's control over the estate's property and the affiliates' property. To make matters even worse, the Plan provides that the liquidating trustee will be operating outside of the purview of the Bankruptcy Court's supervision and will not be subject to the Bankruptcy Code. The Trust Agreement which will supposedly govern the Trustee is not included with the Disclosure Statement, but apparently will be disclosed later. Disclosure Statement, p. 19.

Further, the Disclosure Statement does not explain potential legal issues associated with this Court confirming a plan that would require that the liquidating trustee be installed as a manager of various entities. To whom would such a liquidating trustee answer? Is there a client? Can the Debtor replace the liquidating trustee? How, and by whom, would the liquidating trustee be replaced? What if one or more other persons own an interest in the affiliates? What if the entity formation documents do not allow the installation of a trustee as a manager? Can the liquidating trustee change those documents as suggested in the Plan? Would the trustee be bonded? Would he be insured?

Callais does not understand from the Disclosure Statement and Plan how the liquidating trustee will be in a position to administer and liquidate the affiliates' assets. Even ignoring this structural deficiency, the factual premises of the Disclosure Statement and Plan appear to be, at best, completely far-fetched. On page 11 of the Disclosure Statement, the Debtor and the UCC state that "[t]he financial outlook for the Debtor is very bright, as the primary basis for funding the Liquidating Trust, the sale of assets of the Debtor and his companies, should be sufficient to fund payments to all allowed claims." However, as detailed below, the information provided in the Disclosure Statement simply does not support this assertion.

***Insufficient and Inaccurate Information Regarding Claims and Claims Administration***

The Disclosure Statement indicates that claim objections may be filed "at any time." DS, p. 2. However, other than Callais, the Disclosure Statement does not identify any other claims to which the Debtor or the Liquidating Trustee would object. The Debtor should disclose any known objections to claims. The Debtor's schedules indicate a number of liabilities to individuals that were not listed in his 2015 financials and do not appear to be associated with the acquisition of any property, including but not limited to: Bill Boles: $400,000, Dave Roberts: $300,000, EAW Family Trust: $16,000,000, Glen Yoes: $1,500,000, John O'Hern: $1,100,000, and Harold Estes: $3,000,000. Does the Debtor intend to object to these or any other claims?

At the meeting of creditors, the Debtor was not able to explain what he did with the proceeds of the loans about which he was questioned. The Debtor should provide this information.

The Disclosure Statement also provides that the Liquidating Trustee may settle objections to claims without approval of the Bankruptcy Court. DS, p. 17. The Debtor fails to explain the basis for such power. Likewise, the Disclosure Statement provides that no claim shall be deemed allowed absent an order allowing such claim. DS, p. 18. Again the Debtor fails to advise of the

9

basis upon which he should entitled to change Bankruptcy Code section 502(a) which provides that claims are deemed allowed until an objection is filed. Nor does the Debtor explain how a claim that is settled without Bankruptcy Court approval could become an allowed claim.

Even stranger is section 6.15 of the Plan which provides that 28 days after the Effective Date all holders of claims that are not Allowed Claims must surrender the instrument evidencing the debt to the liquidating trustee and the note shall be canceled. Taken with the other provision discussed above, every creditor whose claim is evidenced by an instrument would lose their claim if they had not obtained an order allowing the claim within 28 days after the effective date (since the only allowed claims are those allowed by an order). The Debtor should explain the legal basis for this provision. Likewise, section 8.5 of the Plan appears to be an attempt to replace Bankruptcy Code section 553 governing setoff without an explanation as to the legal basis for the provision.

Further, as explained on page 29 of the Disclosure Statement, the Debtor reserves the right to object to any settlement of the purported claims by or against Callais, his ex-wife and his ex-employer. Callais does not understand the legal basis upon which the Debtor should be permitted to object to certain resolutions and not others. Notably, the Debtor does not reserve the right to object to his family trust's purported $16,000,000 claim or the other individuals he listed with millions of dollars of claims that were not listed in his 2015 financials.

The Debtor inaccurately and misleadingly describes his obligations to Callais. DS, p. 7. First, the Debtor understates the amount of the Callais claim by more than seven million dollars. Due to the size of the Callais' unsecured claim, Callais submits that the Debtor should accurately set forth his obligations to Callais so that creditors can better assess the size of the unsecured class and their potential recovery. Callais has filed a proof of claim with a full accounting of the amounts due. The Debtor states on page 9 of this Disclosure Statement that the Callais' claim is "roughly

$17 Million" while the Callais proof of claim establishes that its claim is $24,847,447.80.

In addition, in an effort to somehow present a picture that creditors are going to be paid in full in this case, the Debtor indicates that he has a defense to the claim because he signed the guarantees of the Sqor debt under an "extreme amount of pressure . . . " This is not a valid defense to his obligation and the Debtor should so state in the Disclosure Statement. Further, the Debtor then asserts that "the guarantee constitutes a fraudulent transfer under Section 548 of the Bankruptcy Code and plans to bring an adversary proceeding against Callais on those grounds." Worley induced Callais to loan Sqor millions of dollars hoping to cash in on his substantial equity position in this internet company and now is going to annul his guaranties? If there is any legal basis for such a claim to avoid such a downstream guaranty (such guaranties exist in nearly every commercial lending situation; to avoid such guarantees would instantly change the world of banking), the Debtor should explain the legal basis in his Disclosure Statement. Creditors can then assess whether a plan that would have their money spent on such litigation is worthwhile.

In fact, the Debtor fails to disclose his ownership percentage interest in Sqor, Inc. DS, p. 7. Further, the Disclosure Statement misleadingly suggests that "Callais had an independent evaluation done on the company . . . " The Debtor should correct this statement to provide that Callais agreed to pay for the evaluation but certainly it was not requested by Callais. Further, the Debtor suggests that Sqor had "found several potential buyers" when "Callais foreclosed on the company and immediately demanded payment." This is simply false and offensive. In fact, Callais never foreclosed on Sqor and at the Debtor's urging did not take action to immediately demand payment or enforce its rights despite many months of defaults and broken promises. The Debtor should strike these inaccurate statements. If the Debtor believes there were real potential buyers, the Debtor should identify them in its Disclosure Statement and to the Chapter 7 Trustee of Sqor,

Inc. Callais certainly did nothing to prevent a sale and did everything to assist in a sale. The Debtor's contention that there were real potential buyers may have been yet another ploy to get Callais to loan Sqor more money. The statement does not belong in a Disclosure Statement unless it can be supported by specifics.

*Insufficient and Inaccurate Information Regarding Assets and Asset Administration*

Page 3 of the Disclosure Statement references a Fair Labor Standards Act lawsuit against Worley Claims Service that allegedly resulted in a $20 million dollar settlement half of which was "due from" the Debtor. The Disclosure Statement should provide the case number and court for this lawsuit, explain why the Debtor would have owed funds toward a settlement, and state whether such liability was paid by the Debtor and when.

On pages 3-4 of the Disclosure Statement the Debtor explains that Worley Claims Service was sold in 2014 for $212M from which the Debtor received $52M before taxes which he used to pay taxes and debts. The Debtor should provide the amount of taxes paid and the specific debts paid and when.

On page 4 of the Disclosure Statement the Debtor indicates that the Debtor had ten million shares after Aquiline purchased Worley Claims Service and was receiving a salary. The Debtor states that the salary was discontinued without explanation. The Debtor does not address the ten million in shares and gives very little information about the agreement he had with Worley Claims Service and why his payments were terminated. The Disclosure Statement should be amended to fully address these facts.

On page 8 of the Disclosure Statement the Debtor references his antique collection. In his 2015 financial statement, the Debtor listed his antique collection at $50,908,000. Two years later, the Debtor lists his antique collection at $2,500,000. Given the size and rapid reduction in the

value of these assets, Callais requests that the Debtor provide a detailed report on the original basis for the $50,908,000 value (the original lists with appraisals), the date that each antique was sold and the amount received, and the location and value of each remaining antique. If there are any items for which the Debtor cannot account, the Debtor should fully explain whatever facts may relate to any such item's disappearance.

On page 10 of the Disclosure Statement, the Debtor states that " . . . the creditors will be paid through the liquidation of the Debtor's non-essential property." However, the Disclosure Statement and Plan do not identify what property is "essential" and what property is "non-essential" and how any such determination was made.

On page 10 of the Disclosure Statement, the Debtor lists "the Debtor's negotiations with potential purchasers of various assets" as a material postpetition event. The Debtor should disclose what assets he is referencing and the status of his efforts to sell assets.

Page 42 of the Disclosure Statement provides that a risk factor is "an unforeseen downturn in the real estate market in Baton Rouge causing a reduction in projected occupancy or rental rates." The Disclosure Statement does not reflect that the Debtor or his affiliates own any rental property in Baton Rouge. The Debtor should disclose the properties referenced in this statement.

The Disclosure Statement provides a list of causes of action that will be retained. DS, p. 27-28; 30. As set forth above, Callais believes that valuable causes of action may exist with respect to the incredible change in the Debtor's purported net worth over a two year period. However, Callais does not believe that the UCC has conducted a sufficient investigation of potential claims and is concerned that claims not specifically retained may be lost.

The Fifth Circuit has held that "absent 'specific and unequivocal' retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast

an intelligent vote." *In re United Operating*, 540 F.3d 351, 355 (5th Cir. 2008). In *Texas Wyoming Drilling*, the Fifth Circuit held that "the purpose of the rule is to put creditors on notice of any claim [the debtor] wishes to pursue after confirmation and enable creditors to determine whether the proposed [p]lan resolves matters satisfactorily before they vote to approve it." *In re Tex. Wyo. Drilling*, 647 F.3d 547, 550 (5th Cir. 2011). The rule allows timely and comprehensive resolution of the estate and effective administration and settlement of all of the debtor's assets and liabilities within a limited time. *United Operating*, 540 F.3d at 355. For example, in *United Operating*, the plan preserved only the types of claims arising under the Bankruptcy Code. *United Operating*, 375 F.3d at 355. Post-confirmation, the plaintiff tried to bring common-law tort-based claims. *Id.* The court held that neither the plan's blanket reservation of "any and all claims" arising under the Bankruptcy Code nor its specific reservation of other types of claims under various Bankruptcy Code provisions were sufficient to preserve the common-law claims. *Id.*

Also unclear is who will prosecute the claims. Page 30 of the Disclosure Statement provides that the Debtor and the Liquidating Trustee will prosecute the claims. Other sections of the Disclosure Statement and Plan suggest that the claims will be placed into the trust and prosecuted by the Liquidating Trustee. The Disclosure Statement should make this clear.

Further, the Debtor should explain what he did with the additional loan funds he obtained since the 2015 financials. The Debtor's schedules indicate that he dramatically increased the leverage on his assets (now W Resources assets), obtaining millions of dollars of additional financing, and that he borrowed significant additional funds from various sources. However, the Debtor's schedules do not reflect sufficient new assets to correspond to this new debt. What did the Debtor or his affiliates do with what appears to be a very large sum of money in the two years before he filed?

Callais further requests that the Debtor explain what happened to other assets listed in his 2015 financials but not his schedules. What happened to the $11.7 million dollar interest in Aquiline and the $5.5 million dollar Worley Claims payout receivable? What happened to Debtor's stock in Worley's Claims Service? The $2.5 million in cash? The $4.1 million in Bowie Outfitters inventory listed in the 2015 financials?

*The Debtor's Excessive Monthly Expenses and Future Income*

The Debtor's Amended Schedules state that the Debtor has monthly expenses of $41,000 and no ($0) income. Yet the Debtor's monthly operating reports indicate that the Debtor is receiving tens of thousands of dollars each month from W Resources to fund its tens of thousands of dollars in monthly personal expenses.

In the Disclosure Statement, the Debtor states that "[t]hese statements are not intended to demonstrate that the Debtor is generating sufficient cash flow to fund the proposed payments under the Plan, but to indicate his general household living budget." DS, p. 10. Does the Debtor intend to continue to incur living expenses of $41,000 per month? Where will the funds come to pay these living expenses? If from W Resources, will the Liquidating Trustee approve these expenses? How can the Trustee, who will have a duty to W Resources' creditors, allow it to fund the Debtor's $41,000 a month lifestyle? If W Resources were in bankruptcy its funds could no longer be siphoned out by the Debtor.

The Disclosure Statement is not clear as to the future living expenses of the Debtor and the source of funds for such living expenses. On page 10 of the Disclosure Statement, the Debtor states that he "anticipates having sufficient income from his work normal living expenses so that all net proceeds from the sale of the Debtor's property can go to creditors." Callais does not understand this sentence; income is not generated from expenses. The Disclosure Statement

should specifically identify the Debtor's living expenses going forward and provide a budget that cannot be exceeded. The use of cash from the Debtor's assets and the affiliates' assets should not be up to "anticipation" or a future uncertain arrangement with a trustee. It should be clearly defined and controlled so that the creditors can assess the Plan and their potential recoveries.

The Debtor should disclose how he intends to generate income going forward and provide projections of such income. Based on the monthly operating reports, the Debtor does not appear to be employed or generating income. The Debtor should disclose his current status.

Further, the Disclosure Statement suggests that a deal with the Debtor does not appear to be tied to the requisites of the Bankruptcy Code:

> The Debtor reasonably believes that the Liquidating Trustee will be able to sell the Debtor's assets for sufficient amounts to liquidate all allowed claims in this case within two (2) years from the Effective Date. To the extent such payments are not sufficient to liquidate all Allowed Claims within two (2) years from the Effective Date, the Debtor dedicates a portion of his Disposable Income as provided in the Plan to the payment of such Allowed Claims for five (5) years.

DS, p. 11; *compare*, DS, p. 40. Callais was unable to locate a definition for Disposable Income in the Plan.

The definition of the "Postpetition Arrangement" in the Plan indicates that the there will be a five-year contract between Worley and the Liquidating Trustee whereby the Debtor will keep 60% to 75% of his net disposable earnings over the five year period (with the Liquidating Trustee's right to any such proceeds terminating after the fifth year). No explanation is provided as to how this arrangement was reached or how it is related to what is normally required in individual Chapter 11 cases.

As an initial matter, "net disposable earnings" is not defined. Will this be defined? Will the Debtor be allowed to continue to live on a $41,000 monthly budget? Why? Why is the Debtor then getting 60-75% of the "net disposable earnings"? What happens in the first two years? The

Disclosure Statement indicates that the Debtor will keep all income unless all the claims are not paid? Why will there be a contract instead of placing the provisions in the Plan? Will the Debtor's "projected disposable income" under section 1129(a)(15) be calculated by the court through "a judicial determination of the expenses that are reasonably necessary for the support of the debtor and his or her dependents" or does the Plan somehow address this? Neither the Plan nor the Disclosure Statement clearly explain this "arrangement" and why it varies from what is in the Bankruptcy Code.

Further, Callais understands that one of the Debtor's affiliates owns a Gulfstream Jet. The Debtor should disclose his use of this aircraft since the filing of bankruptcy and how this private aircraft use was funded. Further, the April monthly operating report lists large payments for life insurance. While the Debtor lists a Northwestern Mutual policy with a cash surrender value in his schedules, the Debtor does not identify the amount of coverage and whether the policy provides any potential benefit to creditors. The Debtor should explain why he is using his postpetition income which belongs to the estate to pay for this policy.

*Debtor's Discharge and Release*

Page 34 of the Plan provides that the Debtor shall be entitled to a discharge to the fullest extent provided under section 1141. As stated above, Callais has objected to the Debtor's discharge and would request that the Debtor and UCC clarify that if Callais is successful in such objection that this provision would not affect the denial of the discharge of the Debtor's obligations to Callais.

The Plan is not clear as to whether the Debtor is receiving any other sort of release. The Disclosure Statement states: "[t]his may include taking action against Worley with respect to any residential lease of property by an Affiliate should Worley default in his obligations to the Trust

17

during the term of the Plan." DS, p. 20. What does this mean? Is there some lease that is relevant to this case? What is it? What action would be taken by the Liquidating Trustee?

Likewise, Plan section 13.3 purporting to grant a full injunction should be clarified to exclude Callais to the extent it is successful in its objection to Debtor's discharge and should further clarify that the injunction does not under any circumstances apply to creditors' actions against the affiliates and their properties.

*Specific Material Information Omitted*

The Disclosure Statement is signed by counsel for the Debtor and the UCC. However, the Disclosure Statement is not clear as to whether the UCC has approved the information contained therein or what information was provided to the UCC in connection with Disclosure Statement. DS, p. 43. The Disclosure Statement should specify what information has been confirmed by the UCC and what information constitutes the Debtor's assertions.

Also, the Plan contemplates Plan Supplements which are to be filed on an unknown date prior to the Voting Deadline. Plan, p. 8. The Debtor does not identify these documents or when they will be filed. Plan, p. 8. The Plan also states that the Plan Supplement (which appear to include promissory notes?) will be provided 14 days after confirmation. Plan, p. 36. Any documents relating to the Plan should be made a part of the Disclosure Statement and not provided at a subsequent date.

The Disclosure Statement does not include projections for recoveries and the assumptions upon which any projections are based. The Disclosure Statement does not include a Chapter 7 liquidation analysis. These documents should be included in the Disclosure Statement.

## **CONCLUSION**

The proposed Disclosure Statement describes a Plan that is not feasible and therefore not

confirmable. Simply put, a liquidating trustee appointed in this case cannot properly liquidate or administer the affairs of entities that are not in bankruptcy. Further, as set forth herein, the Disclosure Statement contains inaccurate and misleading information that should be corrected and omits material information that should be provided for creditors to properly assess the Plan.

    Respectfully submitted,

    CARVER, DARDEN, KORETZKY, TESSIER
    FINN, BLOSSMAN & AREAUX, L.L.C.

    /s/ David F. Waguespack_____
    DAVID F. WAGUESPACK (#21121)
    PETER J. SEGRIST (#35314)
    1100 Poydras Street, Suite 3100
    New Orleans, Louisiana 70163
    Telephone: (504) 585-3882
    Fax: (504) 585-3801

    Counsel for Callais Capital Management, LLC

4847-8914-3912, v. 1