**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF LOUISIANA**

IN RE:

**MICHAEL ALLEN WORLEY**                                          **CASE NO. 18-10017**

      **Debtor**                                                                               **CHAPTER 11**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**OBJECTION OF CREDITOR UNITED MISSISSIPPI BANK TO THE
DEBTOR'S DISCLOSURE STATEMENT AND THE DEBTOR'S
CHAPTER 11 PLAN OF REORGANIZATION**

United Mississippi Bank ("*UMB*"), a creditor in this case, by and through undersigned counsel, submits this Objection (the "*Objection*") to approval of the *Disclosure Statement for Plan of Liquidation Under Chapter 11* (the "*Disclosure Statement*") [ECF Dkt. No. 98] filed by the individual debtor, Michael A. Worley (the "*Debtor*"). Among other objections, UMB specifically objects to the Disclosure Statement insofar as it misrepresents or fails to list UMB's status as a secured creditor, omits assets properly included as property of the estate, fails to demonstrate that the proposed plan is feasible, and fails to provide information necessary for creditors to make an informed decision about the plan. In support of such Objection, UMB states as follows:

**FACTUAL BACKGROUND**

1. Beginning on October 9, 2009, UMB extended credit to the Debtor through multiple agreements executed by the Debtor and also his affiliated entities, Dunleith Plantation, LLC and W. Resources, LLC (the "*Affiliate Entities*").

2. On October 9, 2009, the Debtor executed a *Deed of Trust* covering immovable property located at 100-110 Main Street/105 South Broadway Street (the "*Main Street*

1

*Property*") owned by him personally and housing Bowies Tavern and Bowie Outfitters located in the city of Natchez, Mississippi. The Deed of Trust, last modified on August 31, 2017, is attached hereto as **"Exhibit A"** and incorporated herein by reference. On that same day, the Debtor executed a *Commercial Security Agreement* covering "All Inventory, Chattel Paper, Accounts, Furniture, Fixtures, Equipment, and General Intangibles used in commercial business operations by Michael A. Worley" at the Main Street Property (the "*Main Street Personal Property*"). According to property records from Adams County, Mississippi, the Debtor is the record owner of the Main Street Property. The Commercial Security Agreement is attached hereto and incorporated herein by reference as **"Exhibit B."**

3.   On May 4, 2010, the Debtor executed a promissory note in his personal capacity in favor of UMB in the principal amount of $2,800,357.50 (the "*Original Note*"). On that same day, the Debtor and Dunleith Plantation, LLC ("*Dunleith*") executed a Commercial Security Agreement whereby Dunleith conveyed to UMB a security interest in "All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Furniture, and Fixtures, whether now owned or which may become attached to property of Dunleith Plantation, LLC" (the "*Dunleith Personal Property*"), located at 84 Homochitto Street, Natchez, Mississippi, 39120 (the "*Dunleith Plantation*") to secure the indebtedness under the Original Note and any other agreements executed by the parties. The Commercial Security Agreement is attached hereto as **"Exhibit C"** and incorporated herein by reference. Also on May 4, 2010, Dunleith conveyed all right, title, and interest in Dunleith Plantation to J. Barrett Martin as trustee for the benefit of UMB ("*Deed of Trust*"). The Deed of Trust, last modified on August 31, 2017, attached hereto as **"Exhibit D"** and incorporated herein by reference, contains a cross-collateralization

provision securing all obligations, claims, debts, and liabilities owed by Dunleith or the Debtor to UMB, whether then existing or arising thereafter.

4. On October 1, 2013, the Debtor assigned to UMB as collateral for the indebtedness owed to UMB his interest as owner of two life insurance policies issued by Northwestern Mutual Life Insurance Company, policy numbers 13425770 and 14547460 in the principal amounts of $500,000.00 and $501,101.00, respectively, (the "***Insurance Policies***"), which, as of early 2018, had cash surrender values of $293,152.60 and $264,960.68, respectively. The Commercial Security Agreements granting a security interest over the Insurance Policies in favor of UMB is attached hereto as **"Exhibit E"** and incorporated herein by reference.

5. The Disclosure Statement references a Community Property Partition Agreement between the Debtor and his former spouse, Kathy Worley, attached as an exhibit to the Debtor's amended schedules (the "***Partition Agreement***").[1] Pursuant to the Partition Agreement, each party conveyed and assigned to the other party half of their interest in their matrimonial domicile located at 22784 Ligon Road, Zachary, Louisiana 70791 (the "***Ligon Property***"). Additionally, the Partition Agreement granted to Kathy Worley the right to receive "[t]he net sale proceeds from the sale of the Annie Oakley Gun and Trunk."

6. On August 31, 2017, W Resources, executed a Mortgage in favor of UMB to secure the indebtedness of the Debtor over real property owned by W Resources located at 4 Cattle Drive, Philipsburg, Montana (the "***Montana Ranch***"). The Mortgage over the Montana Ranch is attached hereto as "**Exhibit F**" and incorporated herein by reference. On March 7, 2017, W Resources executed a Trust Indenture over real property constituting a house at 4 Cattle Drive contiguous to the Montana Ranch to secure the Debtor's obligations to UMB (the "***Montana House***"). The Trust Indenture is attached hereto as **Exhibit "G"** and incorporated

---

[1] ECF Docket No. 56-3.

herein by reference.

7. On August 31, 2017, the Debtor executed a Promissory Note (the "***2017 Note***") in favor of UMB in the principal amount of $7,280,639.25 (the "***Indebtedness***") extending previous promissory notes numbered 7125545, 7080179, 7098197, 7101710, and 7120801. The Debtor acknowledged that the 2017 Note was secured by all trust indentures, deeds of trust, commercial security agreements, and assignments previously executed by the Debtor and/or one or more Related Entities specifically listed in the 2017 Note (attached hereto as **Exhibit "H"** and incorporated herein by reference).

8. The Montana Ranch, Montana House, the Main Street Property, the Dunleith Plantation, the Main Street Personal Property, the Dunleith Personal Property, and the Insurance Policies all secure the entire Indebtedness under the 2017 Note. Whereas the Montana Ranch, the Montana House, the Dunleith Plantation, and the Dunleith Personal Property are owned by the Affiliate Entities, the Main Street Property, the Main Street Personal Property, and the Insurance Policies are personal assets of the Debtor.

## PROCEDURAL BACKGROUND

9. On January 08, 2018, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Louisiana (the "***Petition Date***").

10. Since the Petition Date, the Debtor is continuing in possession of his property and is operating and managing property of the estate as debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.

11. On April 26, 2018, the Debtor filed amended schedules listing the following unsecured debts as due and owing to UMB in the aggregate amount of $6,700,000.00:

a. An unsecured claim in the amount of $4,200,000.00 secured by the Homochito Property (the "Dunleith Plantation") with Dunleith Plantation, LLC listed as co-debtor;

b. An unsecured claim in the amount of $1,500,000.00 secured by the Main Street Property with Bowies Tavern listed as co-debtor; and

c. An unsecured claim in the amount of $1,000,000.00 secured by the Ranch Montana with its record owner W Resources as co-debtor.[2]

12. The Debtor has listed in his schedules an interest in real property located at 22784 Ligon Road, Zachary, Louisiana 70791 (the "*Ligon Property*"), which the Debtor describes as "Former Community Property – Still Owned w/ Kathy Worley."[3] The Debtor values the Ligon Property at $8,500,000.00 and values his own interest in the Ligon Property at $4,250,000.00.

13. In his bankruptcy schedules, the Debtor has claimed as exempt an interest in an insurance policy from Northwestern Mutual naming his former spouse, Kathy Worley as beneficiary, in the amount of $300,000.00.[4] Presumably, Worley's schedules refer to Policy Number 13425770, which has a cash surrender value of approximately $300,000.00.

14. On May 8, 2018, Worley filed the *Disclosure Statement for Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Debtor in Possession and the Official Committee of Unsecured Creditors as of May 8, 2018* (the "*Disclosure Statement*"), to which UMB hereby objects. Concurrently with the filing of the Disclosure Statement, the Debtor filed a *Chapter 11 Plan of Liquidation Proposed by Debtor in Possession and the Official Committee of Unsecured Creditors* (the "*Proposed Plan*").

15. Section VI of the Proposed Plan provides for the appointment of a liquidation trustee for the purpose of marketing and liquidating property of the estate. Additionally, the Liquidating Trustee is to be the appointed manager of each of the debtor's related entities, with

---

[2] See ECF Docket No. 90, pp. 12-13.
[3] See ECF Docket No. 18, p. 12.
[4] See *id.* p. 10.

5

the authority to "cause the property of any Affiliate or Affiliates to be sold."[5] However, as set forth more fully herein, the Debtor has omitted assets qualifying as property of the estate, has failed to describe and value listed assets adequately, has failed to make a sufficient showing regarding feasibility, and has made reference to an injunction that may be so broad and ambiguous as to cover all actions by all professional persons in connection with estate and non-estate properties owned by related entities, requiring amendment of the Disclosure Statement. The Debtor also has not discussed the issue of the community property interests of Kathy Worley being liable for the community property debts of the Debtor.

## OBJECTION

### A    Standard for Approval of Disclosure Statement

16.    To be approved, a disclosure statement must offer "adequate information" that would enable a "hypothetical investor of a relevant class to make an informed judgment on the plan." See, *In re U.S. Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996); *In re Woerner*, 783 F.3d 266, 271 (5th Cir. 2015).

17.    In order for a disclosure statement to contain adequate information under Section 1125 of the Bankruptcy Code, it must contain all factors presently known that bear upon the success or failure of the reorganization plan. *See, e.g.*, *In re Microwave Products of America, Inc.*, 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989). The following factors, among others, have been considered by courts in evaluating the adequacy of a disclosure statement:

> (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their values; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting

---

[5] See ECF Docket No. 98-1, p. 24.

method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016).

18. In evaluating whether a disclosure statement contains adequate information, a court "shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing such information." *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).

### B.     The Disclosure Statement Fails to Provide Adequate Information

19. For the reasons set forth more fully below, the Disclosure Statement falls short in providing adequate information by which creditors would be able to make an informed judgment on whether to vote for or against confirmation of the Plan in this case.

### *i.)     The Debtor Has Omitted Property of the Estate from the Disclosure Statement and Thus Failed to Provide Adequate Information.*

20. A disclosure statement must contain a list of the Debtor's available assets and their values and provide the accounting method employed to arrive at such values. *Id.* The Disclosure Statement fails to fulfill these requirements insofar as the Debtor has failed to disclose all assets owned by the Debtor, has failed to provide the accounting method used to value the assets, and has claimed an exemption over property waived through assignment.

21. As referenced in the attached Deed of Trust and Commercial Security Agreement, the indebtedness due on the 2017 Note was secured in part by the Debtor's interest in the Main Street Property and the Main Street Personal Property. Unlike the remaining immovable property serving as collateral for the Indebtedness, the Debtor himself owns this property, rather than one of the Affiliate Entities. This property is not listed in Schedule A of the Debtor's Statement of Financial Affairs or the Disclosure Statement. Having failed to disclose these assets, much less provide for their administration under a plan of reorganization, the Disclosure Statement has failed to provide a full description of assets, preventing creditors from making an informed decision regarding acceptance of the Proposed Plan, requiring amendment to the Disclosure Statement to provide a comprehensive itemization of the assets held by the Debtor.

22. The improper classification of the Life Insurance Policies as exempt from property of the estate has further deprived creditors of adequate information regarding the Debtor's assets. In his schedules, the Debtor claimed the cash surrender value of Life Insurance Policy No. 13425770 as exempt pursuant to 11 U.S.C. § 522, which authorizes debtors to exempt property exempt from seizure under state law. However, the Debtor pledged the Life Insurance Policies to UMB, thereby waiving the exemption.

23. The state law exemption defined by La. R.S. §22:912, the current version of the Louisiana statute cited by the Debtor, provides in relevant part: "the lawful beneficiary, assignee, or payee, including the insured's estate, of a life insurance policy or endowment policy, shall be entitled to the proceeds and avails of the policy against the creditors and representatives of the insured …. For purposes of this Subsection, the proceeds and avails of the policy include the cash surrender value of the policy." La. R.S. § 22:912A)(1).

24. Louisiana law recognizes an implied waiver of statutorily-exempt property in

cases where the relevant statute does not require that waiver be express. For example, in *Aetna Finance Co. v. Antoine*, 77-7906 (La. App. 5 3/15/77), 343 So.2d 1195, the Fourth Circuit held that implied waiver through the conduct of granting a security interest in a third party was sufficient to waive an exemption over property under La. R.S. § 13:3881: "Defendant, in consenting to the mortgage, by necessary implication, waived his exemption, otherwise he would not have been granting a mortgage at all, but only a mere sham. The implied waiver, as appears from the authorities cited, is a valid waiver." *Id.* at 1198. As the statute governing exemptions for life insurance policies does not require that waiver of the exemption be express, it follows that an implied waiver through the conduct of executing the assignment is sufficient to deprive the Debtor of the exemption.

25.     The Insurance Polices assigned by the Debtor, attached hereto as "**Exhibit I"** and incorporated by reference, permit assignment and further provide that "[t]he interest of any beneficiary will be subject to any collateral assignment made either before or after the beneficiary is named." The Insurance Policies each secured the Indebtedness up to and including "any and all present and future liabilities of the undersigned [*i.e.*, the Debtor]." As the amount of the Indebtedness exceeds the total value of the Insurance Policies, the Debtor has fully waived the statutory exemption for insurance proceeds and any interest of Kathy Worley as beneficiary is subject to and primed by the interest held by UMB. Accordingly, the Debtor's claim of exemption is ill-founded, and the Life Insurance Policies, including the cash surrender values thereunder, are property of the estate in which UMB holds a first position security interest.

26.     In addition to the misidentification of Life Insurance Policy No. 13425770 as exempt, the Debtor has wholly failed to identify the other pledged Insurance Policy, Life Insurance Policy No. 14547460 in Schedule A, presenting further deficiency with respect to the

disclosure of the Debtor's assets.

27. Furthermore, the Debtor failed to list the Dunleith Personal Property and the Main Street Personal Property against which UMB holds a security interest in accordance with the Commercial Security Agreements attached hereto and incorporated herein by reference.

28. Finally, the Debtor failed to list the Montana House as an asset encumbered by the attached Montana Mortgage in favor of UMB granted by W Resources.

29. Without clarifying the errors detailed above, creditors have no idea whether assets mortgaged and pledged for payment under the Proposed Plan represent all of the assets owned by the Debtor and subject to the jurisdiction of the bankruptcy court, presenting the danger of the Debtor holding back assets which should go into the estate to benefit its creditors.

### ii.) *The Disclosure Statement Fails to Provide an Adequate Description of the Debtor's Listed Assets or Their Value.*

30. As part of its Disclosure Statement, a debtor is required to provide "a description of the available assets and their values," "the source of information stated in the disclosure statement," and "financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan." *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016). Here, however, the Debtor has wholly failed to provide a comprehensible description or meaningful valuation of the assets disposed of under the Plan.

31. Rather than provide a description of assets and valuation sufficient to permit creditors to make an informed decision regarding acceptance of the Proposed Plan, the Debtor merely identifies property with a generic description and assigns value to the assets without providing the method used to arrive at the valuations. For example, the Debtor proposes to satisfy the claims of MidSouth Bank through a sale of the Debtor's antiques, consisting largely

of Wild West memorabilia, over which MidSouth Bank purportedly holds a security interest.[6] The Disclosure Statement contains no information regarding the antiques apart from a generic valuation of $2,500,000.00. Although an amendment to the Debtor's schedules provides a list of the antiques and an assignment of value, the Debtor has not identified an appraisal, the source of the information, or provided any information regarding the methodology employed to value these assets.[7] Assurances regarding the valuation of these items are particularly crucial in the instant case given the unique nature of the items to be sold. As a result, the Debtor has not provided information necessary for creditors to determine whether the sale of such assets will provide them recovery. Without attributing the valuation to a third-party source or providing the methodology used by the Debtor in reaching these values, creditors must rely on the Debtor's unsubstantiated "word" as to the accuracy of the figures.

32. Furthermore, Section 3 of the Disclosure Statement describes assets held by the Debtor's related entities, which the Debtor proposes to sell to fund the liquidation plan by assigning a "low value" and "high value," without detailing what these terms mean (*e.g.*, liquidation value, market value, replacement value).[8] Whatever metrics these generic high and low values represent, the Debtor has failed to provide the foundation used to arrive at such figures, giving creditors no indication as to their accuracy.

33. To remedy the errors and ambiguities set forth above, the Debtor should amend the description of assets to include an itemized list of antiques, and all other assets, as well as the valuation method employed in arriving at such figures and to seek a comprehensive appraisal of all assets that have not been appraised, as may be proper under the circumstances. Such

---

[6] See ECF Docket No. 98, p. 13.
[7] ECF Docket No. 56-1.
[8] ECF Docket No. 98, p. 5.

amendments are necessary for creditors to make an informed decision regarding the Debtor's Proposed Plan.

### *iii.) The Disclosure Statement Fails to Provide an Adequate Description Regarding Feasibility of the Plan With Respect to Income from the Debtor.*

34. In order to make a sufficient showing that a Chapter 11 plan is feasible, a debtor must show a reasonable probability of success. *In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 715 (Bankr. M.D. La. 1999). "A plan may not be speculative or be based on unreasonable assumptions." *In re Cantu*, 298 Fed. App'x 76 (5th Cir. 2010) (internal citations omitted). Because the sales process described in the Disclosure Statement is based on speculation regarding Worley's ability to procure optimal employment and to effectuate the sale of property owned in whole or part by non-debtor entities, the Disclosure Statement fails to provide adequate information regarding feasibility of the Plan.

35. The Disclosure Statement represents that the Proposed Plan will be consummated in part through future income to be generated from Worley's employment in his former primary occupation, the claims business.[9] Notably, the Debtor cites the possibility of this future income as a primary advantage of a chapter 11 liquidation as opposed to a chapter 7 liquidation. However, Worley himself admits that he is currently subject to a non-compete agreement executed in connection with his exit from his former business, Worley Claims Services, LLC, which bars Worley from engaging in such work. Accordingly, apparent substantial impediments hinder Worley's ability to carry out the terms of the Proposed Plan as described in the Disclosure Statement, raising significant doubts regarding feasibility of the Proposed Plan and realization of the supposed benefits of the Proposed Plan relative to a chapter 7 liquidation.

---

[9] See ECF Docket No. 98, p. 10.

### *iv.) The Disclosure Statement Fails to Provide an Adequate Description Regarding Feasibility of the Plan With Respect to Sale of Non-debtor Assets.*

36. The Disclosure Statement and other filings submitted by the Debtor in connection with this case indicate that third-party consents are necessary in order for the Debtor to sell the primary assets pledged to fund the Proposed Plan; namely, the Ligon Property, a firearm purported owned by Annie Oakley, and assets owned by non-debtor entities. As the Debtor has not disclosed whether such consents will be forthcoming, creditors are without sufficient information regarding key aspects of the Plan, and amendment to the Disclosure Statement is necessary to address these deficiencies.

37. "Property interests are created and defined by state law." *Butner v. United States*, 440 US 48, 55, 99 S Ct. 914 (1979). Under Louisiana law, absent certain exceptions in the case of registered movables, former community enterprises, and court authorization, none of which apply in this case, "[a] spouse may not alienate, encumber, or lease former community property or his undivided community interest in that property without the concurrence of the other spouse." Louisiana Civil Code article 2369. The Partition Agreement terminated the community property regime between the Debtor and Kathy Worley, triggering the requirement of concurrence in order to alienate community property like the Ligon Property, the Debtor's former matrimonial home. As a result, it appears from the Debtor's own representations that third-party consent will be required in order to effect the sale of the Ligon Property. The Debtor's failure to disclose whether consent from Kathy Worley has been obtained or is likely to be obtained, constitutes a failure to disclose a material fact regarding the operation of the Plan and a failure to provide adequate information to creditors.

38. The Partition Agreement granted to Kathy Worley the right to receive "[t]he net

sale proceeds from the sale of the Annie Oakley Gun and Trunk."[10] The Amended Schedules appear to include the Annie Oakley Gun among the antiques to be sold to fund the Proposed Plan and value the gun at $750,000.00, the most valuable item in the list, representing 30% of the total estimated value of the antiques.[11] Separate and apart from the fact that the Debtor has failed to provide an appraisal for any of the assets to be sold pursuant to the Proposed Plan, the proceeds for the sale of this key item appear to have been pledged to another party under state law and thus are not property of the estate.

39. Moreover, the Debtor incurred the Indebtedness during the existence of the community property regime. As a result, Kathy Worley is a co-debtor on the debts owed to UMB and other creditors holding claims that arose during the Worley's marriage. Although the Disclosure Statement references the co-debtor status of the Debtor's related entities, the Debtor fails to provide creditors with adequate information regarding the liability of Kathy Worley on debts arising during the community, and amendment to the Disclosure Statement to provide such information to creditors is necessary.

### *v.) The Disclosure Statement Mischaracterizes UMB's Claims, Fails to Include UMB's Secured Claim, and Omits Certain UMB Collateral.*

40. A disclosure statement must provide adequate information regarding the classification and treatment of claims under a plan of reorganization. As the Debtor attempts to characterize UMB as holding only an unsecured claim, the class structure in the Proposed Plan as detailed in the Disclosure Statement misclassifies UMB's interest and must be amended for the following reasons.

41. As set forth more fully above, UMB holds a pre-petition claim in the total amount of $7,280,639.25 together with accrued and unpaid interest, attorney's fees, expenses, costs and

---

[10] ECF Docket No. 56-3.
[11] ECF Docket No. 56-1.

late fees, evidenced by the 2017 Note, secured by assets belonging to the Debtor and the Affiliate Entities.  Contrary to the evidence provided by the loan documents, the Disclosure Statement, Proposed Plan, and related filings treat UMB as a general secured creditor, ignoring the duly executed security agreements whereby the Debtor mortgaged and granted secured interests in property in exchange for loans from UMB.  In other words, the Debtor holds property against which UMB holds a secured claim.

42.   The Debtor's schedules misstate the amount of total Indebtedness owed as $6.7 million, when, in fact, UMB is owed $7,280,639.25 together with accrued and unpaid interest, attorney's fees, expenses, cost, and late fees.[12]

43.   In addition to the incorrect amount, the Debtor wholly fails to acknowledge UMB's status as a secured creditor.  Rather, the Disclosure Statement and Proposed Plan treat UMB as a general unsecured creditor, ignoring the duly executed agreements whereby the Debtor pledged its interest in property of the estate, namely, the Main Street Property, the Personal Property located at the Main Street Property, and the Insurance Policies.  As evidenced by these security documents, UMB holds a first mortgage lien and security on the Main Street Property, the Main Street Personal Property, and the Insurance Policies, making UMB a secured creditor up to the full value of those assets. Nevertheless, the Disclosure Statement and Proposed Plan incorrectly relegate UMB to unsecured creditor status. As a result, the Disclosure Statement has misclassified UMB's status, resulting in a disclosure statement that fails to adequately represent the relative interests of creditors in the Debtor's case, making an informed decision regarding acceptance of same impossible.

---

[12] See ECF Docket No. 90, pp. 12-13.

### *vi. The Third-Party Releases Are Overly Broad and Non-Specific in Violation of FRBP 3016.*

44. Finally, the injunction language in Section 13.3 of the Plan is vague and ambiguous, and the Disclosure Statement should clarify the intent and extent of this broad and ambiguous provision.

45. The injunction extends to "any professionals authorized to be employed by the Debtor under Order[s] from the Bankruptcy Court, and such persons' respective heirs, executors, estates, servants, and nominees (the "**Protected Persons**") for "any liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to the Debtors, the Chapter 11 Case, or the Estate …"[13]

46. Such broad exculpatory language presumably extends to exculpate the Litigation Trustee from any and all acts in connection with the sale of the Debtor's assets and the assets of related entities. As recovery for creditors under the Proposed Plan hinges primarily upon the sale of these assets, a grant of *carte blanche* authority to the Litigation Trustee over all activities would expose creditors to significant risk. Accordingly, the Disclosure Statement must be amended as to limit the exculpatory language to identify specific exculpated parties, specific actions of the exculpated parties, and/or specific causes of action and/or theories of recovery to which exculpation extends.

### **CONCLUSION**

As set forth more fully above, the Debtor's Disclosure Statement fails to provide adequate information to creditors and should be amended. The Debtor has omitted or claimed as exempt assets that are property of the estate and should thus fund recovery to creditors. Secondly, the assets that are listed are valued accordingly to no surer measure than the

---

[13] See ECF Docket No. 98-1, pp. 35-36.

unsupported assertions of the Debtor. Thirdly, and perhaps most crucially, the Debtor has not sufficiently shown that his plan is feasible, given the significant hurdles to the sales and other sources of revenue proposed by the Debtor that present serious risks to recovery of creditors under the Proposed Plan.

WHEREFORE, for the foregoing reasons, United Mississippi Bank (a) objects to the approval of the Disclosure Statement on the basis that it fails to provide adequate information to allow creditors to make an informed judgment regarding the Proposed Plan, (b) requests that any disclosure statement and plan proposed by the Debtor (including without limitation the Disclosure Statement and Proposed Plan currently proposed by the Debtor) and/or confirmed by the Bankruptcy Court include provisions supplementing, clarifying and/or modifying such pleadings consistent with this Objection, and (c) further requests that this Court grant such other and further relief as may be just and proper.

Respectfully Submitted,

  */s/ Stewart F. Peck*
STEWART F. PECK (#10403)
CHRISTOPHER T. CAPLINGER (#25357)
MEREDITH S. GRABILL (#35484)
**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email:  speck@lawla.com,  ccaplinger@lawla.com; mgrabill@lawla.com
   *Attorneys for United Mississippi Bank*

**AND**

  */s/ Eileen N. Shaffer*
EILEEN N. SHAFFER
*admitted pro hac vice*
Attorney at Law
401 E. Capitol St. Suite 316
Jackson, MS 39215-1177
Telephone: (601) 969-3006
Facsimile: (601) 949-4002
Email: eshaffer@eshaffer-law.com
   *Attorney for United Mississippi Bank*